# EXHIBIT A

Julie C. Erickson, State Bar No. 293111 (julie@eko.law)
Elizabeth A. Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin M. Osborne, State Bar No. 261367 (kevin@eko.law)
**Erickson Kramer Osborne LLP**
44 Tehama Street
San Francisco, CA 94105
Phone: 415-635-0631

**Electronically FILED by Superior Court of California, County of Los Angeles 10/09/2024 4:37 PM David W. Slayton, Executive Officer/Clerk of Court, By C. Vega, Deputy Clerk**

Eric S. Dwoskin, *pro hac vice* forthcoming (edwoskin@dwowas.com)
**Dwoskin Wasdin LLP**
433 Plaza Real, Ste. 275
Boca Raton, Florida 33432
Phone: 561-849-8060

*Attorneys for Plaintiffs*

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
CIVIL UNLIMITED

| | |
|---|---|
| SUELLEN CRANO, KELLY COONEY, individually and on behalf of other similarly situated individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>HILTON WORLDWIDE HOLDINGS INC., and DOES 1-10<br><br>Defendants. | Case No.: 24STCV26306<br><br>CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL<br><br>Complaint for Violations of:<br><br>1. Violation of the Invasion of Privacy Act, Cal. Penal Code § 631(a);<br>2. Violation of the Invasion of Privacy Act, Cal. Penal Code § 632;<br>3. Violation of Bus. & Prof. Code §§ 17200, *et seq.*;<br>4. Unjust Enrichment |

Plaintiffs Suellen Crano and Kelly Cooney, individually and on behalf of all others similarly situated (the "Class Members"), bring this class action complaint against Hilton Worldwide Holdings Inc. ("Defendant" or "Hilton"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, including based on the investigation of the counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used hilton.com, a website that Defendant owns and operates that allows hotel guests to, among other things, book hotel rooms, including hotel rooms at Defendant's hotels in California.

2. Defendant aids and enables a third party, Meta Platforms, Inc. ("Facebook"), to eavesdrop on communications sent and received by Plaintiffs and Class Members, including communications that contain sensitive and confidential "guest records" as defined by Cal. Civil Code § 53.5. By failing to procure consent before enabling Facebook's interception of these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632 and other California consumer protection statutes and state law.

## THE PARTIES

3. Plaintiff Suellen Crano is a resident and citizen of Upland, California. During the relevant period of time, Plaintiff Crano maintained a Facebook account. During the relevant period of time, Plaintiff Crano visited a website operated by Defendant, hilton.com (the "Website"), on the same browser that she used to access Facebook. Plaintiff Crano accessed the Website using a Chrome browser on both her computer and mobile device and also uses her mobile device to access Hilton's application for booking-related services. Plaintiff Crano was in California when she visited the Website. Upon accessing the Website, Plaintiff Crano browsed and booked one or more Hilton hotel rooms, including rooms located in California. Through the systematic process described in more detail below, Defendant enabled Facebook to intercept Plaintiff Crano's communications with the Website—including communications that contained Plaintiff Crano's confidential "guest records," as defined by Cal. Civil Code § 53.5.1—as they were being sent by

Plaintiff Crano or otherwise in transit. Neither Defendant nor Facebook procured Plaintiff Crano's prior consent to this interception. As a result of booking Hilton hotel rooms in the past, Plaintiff Crano presently has "Hilton Honors" points that can be exchanged toward the cost of future Hilton hotel room reservations. Plaintiff Crano anticipates using those points in the future by booking additional hotel rooms on Hilton.com.

4. Plaintiff Kelly Cooney is a resident and citizen of San Diego, California. During the relevant period of time, Plaintiff Cooney maintained a Facebook account. During the relevant period of time, Plaintiff Cooney visited Defendant's Website on the same browser that she used to access Facebook. Plaintiff Cooney accessed the Website using a Chrome browser on both her desktop computer and Android mobile device. Plaintiff Cooney was in California when she visited the Website. Upon accessing the Website, Plaintiff Cooney browsed and booked one or more Hilton hotel rooms, including rooms located in California. Through the systematic process described in more detail below, Defendant enabled Facebook to intercept Plaintiff Cooney's communications with the Website—including communications that contained Plaintiff Cooney's confidential "guest records," as defined by Cal. Civil Code § 53.5.1—as they were being sent by Plaintiff Cooney or otherwise in transit. Neither Defendant nor Facebook procured Plaintiff Cooney's prior consent to this interception. As a result of booking Hilton hotel rooms in the past, Plaintiff Cooney presently has "Hilton Honors" points that can be exchanged toward the cost of future Hilton hotel room reservations. Plaintiff anticipates using those points in the future by booking additional hotel rooms on Hilton.com.

5. Defendant Hilton Worldwide Holdings Inc. is a Delaware corporation with its principal place of business at 1775 Tysons Blvd, FL 7, McLean, VA 22102. Defendant does business across the nation and operates dozens of hotels throughout California.

6. DOES 1 through 100, inclusive, are unknown to Plaintiffs who sue such Defendants by use of such fictitious names. Plaintiffs will amend this complaint to add the true names when they are ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is legally responsible for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

7. At all relevant times, all Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described in each and all of the foregoing paragraphs, unless otherwise indicated.

8. At all relevant times, the unlawful conduct against Plaintiffs and class members as described in each and all of the foregoing paragraphs was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, upon information and belief, the unlawful conduct described in each and all of the foregoing paragraphs was reasonably foreseeable by Defendants and committed under actual or apparent authority granted by Defendants such that all of the aforementioned unlawful conduct is legally attributable to Defendants.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to Article VI, section 10 of the California Constitution and Cal. Code Civ. Proc. § 410.10. This action is brought as a class action on behalf of Plaintiffs and Class Members pursuant to Cal. Code Civ. Proc. § 382.

10. This Court has personal jurisdiction over Defendant. First, as noted above, Defendant operates hotels throughout California. Thus, Defendant has availed itself of the privilege of doing business in California. Second, the Website (and Facebook's wiretapping thereof) is directly linked to Defendant's physical operations in California, in that California residents utilize the Website to book and exchange information regarding Defendant's hotels, including its California hotel locations. Thus, the conduct at issue here is directly related to Defendant's business in California. Finally, Plaintiffs and Class Members were harmed in California because that is where they live, that is where they booked hotel rooms on Defendant's Website, that is where Facebook—as enabled by Defendant—wiretapped Plaintiffs' communications with the Website (*i.e.*, on Plaintiffs computers located in California), that is where Facebook is headquartered, and that is where the information that was wiretapped was sent (*i.e.*, to Facebook's headquarters in California) as it was illegally intercepted.

11. This Court is the proper venue for this action under Cal. Code Civ. Proc. § 395.5 because one of the Plaintiffs was unlawfully wiretapped by Facebook—as enabled by Defendant—in this

County. Thus, a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this County.

## FACTUAL ALLEGATIONS

### I. California Civil Code § 53.5

12. Pursuant to California Civil Code § 53.5(a), hotel operators (and agents thereof) who offer or accept payment for hotel rooms "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order." Cal. Civil Code § 53.5(a).

13. Per Cal. Civil Code § 53.5(c), the term "guest record" includes "any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number."

14. The legislative history of § 53.5 indicates:

a. In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

b. Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

c. Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; ***or stay at a hotel or motel***.

d. California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

e. Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a consumer has, where a consumer lives and works, where a consumer travels and ***where they stay on their trip***, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

f. The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

g. When Californians leave their homes to travel via bus ***or stay at lodging establishments throughout their state***, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure.

h. ***Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses***.

i. Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

15. California S.B. 1194 (September 27, 2018) (emphases added).

16. Thus, "guest records" identifying Website users as Hilton hotel customers or guests are confidential and, under California law, cannot be disclosed to a third party absent a court-issued subpoena, warrant, or order.

## II. The California Invasion of Privacy Act

17. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

18. As the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and ***its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device***.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

19. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire, line, cable or instrument," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

20. CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

21. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

22. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

23. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## III. Facebook, as Enabled by Defendant, Wiretaps Californians' Communications, in Violation of CIPA

### A. Overview of Facebook's Advertising Platform and the Meta Pixel

24. Facebook describes itself as a "real identity platform,"[1] meaning users are allowed only one account and must share "the name they go by in everyday life."[2] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[3]

25. In 2021, Facebook generated $117 billion in revenue.[4] Roughly 97% of that came from selling advertising space.[5]

26. Facebook sells advertising space by highlighting its ability to target users.[6] Facebook can target users so effectively because it surveils user activity both on and off its site.[7] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8]

---

[1] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[3] FACEBOOK, SIGN UP, https://www.facebook.com/
[4] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx
[5] *Id.*
[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[7] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

27. Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

28. Advertisers can also build "Custom Audiences."[10] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[11] With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[12]

29. Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[13]

30. As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[14]

---

[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[10] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[11] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[12] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[13] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[14] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

31. Put succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

32. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[15] However, Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[16] Advertisers can even create their own tracking parameters by building a "custom event."[17]

33. One such Business Tool is the Facebook Tracking Pixel. Facebook offers this piece of code to advertisers, like Defendant, to integrate into their websites. As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[18] When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software surreptitiously directs the user's browser to simultaneously send a duplicate message to Facebook's servers. This second, secret duplicate transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load a website: the website's own code, and Facebook's embedded code.

---

[15] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[16] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142

[17] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; see also FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[18] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

34. An example illustrates the point. Take an individual who navigates to the Website and clicks on a button to browse Defendant's offerings. Once that button is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Defendant utilizes the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Facebook causes the browser to secretly and simultaneously duplicate the communication with Defendant, transmitting it to Facebook's servers alongside additional information that transcribes the communication's content and the individual's identity. This entire process occurs within milliseconds.

35. In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Facebook at the same time as they are being sent to Defendant. Thus, Facebook's interception of these communications occurs as they are being sent to Defendant or otherwise "in transit."

36. After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

37. Facebook's other Business Tools function the same. For mobile applications, advertisers can utilize the Facebook SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[19]

38. Advertisers can also utilize the "Conversions API." The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[20] More technically, the Conversions API is Facebook code that advertisers can implement server-side.[21] Because it operates server-side,

---

[19] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-eventapi/.

[20] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketingapi/conversions-api. This refers to device specific privacy controls.

[21] *Id.*

the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Facebook."[22]

39. When the Conversions API collects "[s]erver events," those data points are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[23]As with the Facebook Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.[24] Facebook "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices."[25]

40. Facebook confirms, in its "Meta Business Tools Terms,"[26] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant. For instance, Facebook can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products." In other words, Facebook can use the wiretapped information for its own "research and development," and well as to "protect" its own products and services.

41. Facebook can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[27]

---

[22] *Id.*
[23] *Id.*
[24] FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one. If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").
[25] *Id.*
[26] FACEBOOK, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.
[27] *Id.*

42. Further, Facebook can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[28]

43. Finally, Facebook can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[29]

44. Thus, Facebook has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provisioning, and securement.

### B. Defendant Enables Facebook, through the Meta Pixel, to Wiretap Californians

#### 1. Facebook, As Enabled by Defendant, Intercepts Californians' Communications

45. Defendant owns and operates the Website. Defendant has integrated the Facebook Tracking Pixel into the Website.

46. On the Website, Website users can, *inter alia*, browse and book Hilton hotel rooms at Hilton properties throughout California.

47. When doing so, Website users provide Defendant with confidential information. This includes "guest records" identifying Website users as Hilton guests, boarders, occupants, lodgers, customers, or invitees (*i.e.*, name and user-specific values contained in Facebook cookies that, like an address or social security number, identify the users in the real world, as described *infra*).

48. Unbeknownst to Plaintiffs and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables Facebook to eavesdrop on those confidential communications using Facebook's Business Tools.

---

[28] *Id.*
[29] *Id.*

49. Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not automatically generated). Instead, as set out below, the confidential communications stem from Website users conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

50. Website users may browse and book Hilton hotel rooms on the Website. To do so, they select the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the number of adults and children who will be traveling, etc. Facebook, as enabled by Defendant, contemporaneously intercepts Website users' button clicks selecting such items—using the Facebook Tracking Pixel.

51. As users progress through the Website's booking process, they visit URLs pertaining to their selections (*i.e.*, destination, desired hotel in that destination, requested travel dates, etc.). Facebook, as enabled by Defendant, contemporaneously intercepts the URL of these webpages visited by Website users—containing the foregoing and/or other information—using the Facebook Tracking Pixel. Facebook also, as enabled by Defendant, contemporaneously intercepts when Website users have progressed to and through Hilton's checkout page, which requires affirmative button presses on the part of Website users.

52. On the Website's checkout page, Facebook, as enabled by Defendant, contemporaneously intercepts a URL demonstrating that the user is reserving a particular room that fits the criteria that they selected (*e.g.*, hotel, location, rooms, travel dates, room rate, etc.), using the Facebook Tracking Pixel. And Facebook, as enabled by Defendant, contemporaneously

intercepts an Event showing that the user has completed the checkout process and the reservation is confirmed.[30]

### 2. Defendant Enables Facebook to Pair Event Data with a User's Identity

53. Along with the foregoing, Facebook's Pixel—as enabled by Defendant—pairs the above-described event data with a user's Facebook ID.

54. A "Facebook ID" is a unique and persistent numerical identifier—just like a social security number or driver's license number—that Facebook assigns to each Facebook user and that: (a) Facebook can use to identify the specific individual associated with the Facebook ID; and, moreover, (b) anyone (not just Facebook) can use to identify the specific individual by simply appending the Facebook ID to the end of https://facebook.com/[Facebook ID]. For example, the Facebook ID for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

55. When a user accesses the Website while logged into Facebook, the Pixel will compel that user's browser to transmit the c_user and fr cookies alongside the above-described information. The c_user cookie contains the user's unencrypted Facebook ID. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[31]

56. When a Website visitor's browser has recently logged out of a Facebook account, Facebook compels the visitor's browser to send a smaller set of cookies too, including the fr, _fbp, and datr cookies.

---

[30] Plaintiffs' investigation identified numerous other tracking technologies that share substantially similar data with other third-parties, such as tracking technologies offered by Google Doubleclick and Snapchat.

[31] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

a. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[32] The fr cookie expires after ninety days unless the visitor's browser logs back into Facebook.[33] If that happens, the timer resets and another ninety days begins to accrue.

b. The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.[34] The _fbp cookie expires after ninety days unless the visitor's browser accesses the same website.[35]

c. The datr cookie identifies a browser.

57. Thus, regardless of whether or not the user is logged into her Facebook account, Facebook receives at least one or more cookies from a Website visitor's browser, including the fr and _fbp cookies.

58. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

59. Defendant uses these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

60. By compelling a visitor's browser to disclose event data for booking, alongside the unique individual identifiers described above, Defendant knowingly discloses information sufficiently permitting Facebook and/or an ordinary person to identify a specific individual's Website activity, including what webpages they visit and what items they view and purchase.

**IV. The Value of The Data Taken from Plaintiffs**

61. Defendant and Facebook profit from their use of Plaintiffs' and Class member's personal data to target them with advertising and for other economic benefits.

62. The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech

---

[32] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[33] *Id.*
[34] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[35] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

industry.[36] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[37] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

63. The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this complaint, including as early as 2013, with its publication "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[38] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[39]

64. In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[40] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

65. Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a

---

[36] https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[37] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[38] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[39] https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

[40] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

> corporate asset and have invested heavily in software that facilitates the collection of consumer information.[41]

66. Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[42]

67. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[43]

68. The cash value of the personal user information unlawfully collected by Defendant provided during the Class Period can be quantified. For example, a group of researchers studied the value that internet users place on their online browsing history and concluded that users value items of their online browsing history at $10.[44]

---

[41] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

[42] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

[43] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

[44] Juan Pablo Carrascal, et al., *Your browsing behavior for a big mac: economics of personal information online*, Proceedings of the 22nd International Conference on the World Wide Web, available at https://dl.acm.org/doi/abs/10.1145/2488388.2488406.

69. Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

70. User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

71. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

72. A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

a. Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[45]

---

[45] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-

b. Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[46]

c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[47]

d. Killi is a new data exchange platform that allows you to own and earn from your data.[48]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[49]

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[50]

---

based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[46] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[47] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[48] https://killi.io/earn/.

[49] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[50] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

73. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[51]

74. The California Consumer Privacy Act (CCPA) recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

**V. Defendant Was Unjustly Enriched from the Use of the Tracking Technologies**

75. The sole purpose of the use of Facebook's Business Tools on Defendant's Website was marketing and profits.

76. In exchange for disclosing Plaintiffs' and Class members' data and communications, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing.

77. Defendant was advertising its services on Facebook, and Facebook's Business Tools were used to help Defendant market on through Facebook's platforms.

78. Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

---

[51] Kari Paul, *Google launches app that will pay users for their dat*a, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacystudy; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-datatechcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-prounounciations-app.

79. Upon information and belief, Defendant re-targeted Plaintiffs and Class members to get them to purchase its products and services.

80. By utilizing tracking technologies, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

81. Through its false representations and unlawful data collection, Defendant is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how they would monetize their own data.

82. Defendant uses customers' guest records to generate revenue. This revenue can come by way of using the data it collects to deliver its own advertisements and services to customers more effectively, selling the data it collects to third parties so that they can direct targeted advertisements to customers, or sharing the data it collects to companies that intend to direct advertisements to customers on the Defendant site thereby generating additional advertising revenue for Defendant. The fact that Defendant generates this revenue is verification that customer's guest records are financially valuable within the online environment where they are exchanged. The value generated by customers' guest records, while small to the customers, is substantial to Defendant. Nevertheless, Defendant does nothing to compensate consumers for the use of their guest records. Nor does Defendant obtain the consent of its customers to sell or share this data. This conduct dilutes the value of its customer's data and deprives its customers of its value.

## VI. Delayed Discovery & Tolling

83. Each unauthorized collection of private, personal data by Defendant is a separate "wrong" which triggers anew the relevant statute of limitations.

84. Further, all applicable statutes of limitation have been tolled by operation of the delayed discovery doctrine, which delays accrual until Plaintiffs have, or should have, inquiry notice of the cause of action. Plaintiffs and Class members were not on inquiry notice despite acting with reasonable diligence. Plaintiffs do not have the expertise in identifying and interpreting the underlying coding and the operation of the fake consent banner in order to discover Defendant's wrongful conduct.

85. Plaintiffs did not discover and could not reasonably have discovered that Defendant was collecting, storing, and using their personal, private data in the ways set forth in this Complaint until they consulted with counsel—shortly before the Complaint was filed.

86. Upon learning about counsel's investigation into Defendant's improper collection, storing, and use of their personal, private data, Plaintiffs diligently sought to uncover the facts, including by consulting with, and hiring, knowledgeable counsel to bring this case.

## CLASS ALLEGATIONS

87. Plaintiffs seek certification of the following class:

> All California residents who have a Facebook account and accessed and navigated the Website while in California (the "Class").

88. Plaintiffs reserve the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

89. **Numerosity**: The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

90. **Existence and Predominance of Common Questions of Fact and Law**: There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class. The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant violated CIPA § 631;

b. Whether Defendant violated CIPA § 632; and

c. Whether Plaintiffs and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

91. **Typicality**: The claims of the named Plaintiffs are typical of the claims of the Class because Plaintiff, like all other class members, visited the Website and had their confidential electronic communications intercepted and disclosed to Facebook.

92. **Adequacy**: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

93. **Superiority**: The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Numerous consumers were cheated out of small sums of money through deliberate behavior of Defendant that they could not practically recover in individual suits. Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### Count I

### Violation of the California Invasion of Privacy Act

### Cal. Penal Code § 631(a)

94. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

95. Plaintiffs bring this claim against Defendant individually and on behalf of the Class.

96. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability

under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

97. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

98. Facebook's Business Tools, including but not limited to the Facebook Pixel, are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

99. Facebook is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Facebook had the capability to use the wiretapped information for its own purposes. Accordingly, Facebook was a third party to any communication between Plaintiffs and Class

Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

100. At all relevant times, by its Business Tools, Facebook willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

101. At all relevant times, Facebook used or attempted to use the communications intercepted by its Business Tools to promote and improve its advertising platform.

102. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Facebook to wiretap Plaintiffs and Class Members using the Business Tools and to accomplish the wrongful conduct at issue here.

103. Plaintiffs and Class Members did not provide their prior consent to Facebook's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class Members' electronic communications. Nor did Plaintiffs and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Facebook's conduct.

104. The wiretapping of Plaintiffs and Class Members occurred in California, where Plaintiffs and Class Members accessed the Website and where Facebook—as enabled by Defendant—routed Plaintiffs' and Class Members' electronic communications to its servers.

105. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a) and injunctive relief to stop the violations alleged herein.

## <u>Count II</u>

## Violation of the California Invasion of Privacy Act

## Cal. Penal Code § 632

106. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

107. Plaintiffs bring this claim against Defendant individually and on behalf of the Class.

108. CIPA § 632(a) prohibits an entity from:

> [I]ntentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

109. Facebook's Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

110. Cal. Civ. Code § 53.5(a) states:

> [A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations, or any employee or agent thereof, who offers or accepts payment for rooms, sleeping accommodations, or board and lodging, or other similar accommodation, shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order.

111. Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

112. Accordingly, any communication that "identifies an individual" Website visitor qualifies as "confidential communication[]" under California law. Specifically, the following pieces of information provided by Plaintiffs and Class Members to the Website constitute "confidential communications": names and user-specific values contained in Facebook cookies as described *supra*, and any other piece of information identifying Website users as Hilton guests, boarders, occupants, lodgers, customers, or invitees, including URLs that disclose that Website users have reserved a room, checked out, paid, and confirmed their room reservation.

113. At all relevant times, Facebook intentionally used its Business Tools to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other.

114. When communicating with Defendant, Plaintiffs and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5. Thus, Plaintiffs and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Facebook, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

115. Plaintiffs and Class Members did not consent to any of Facebook's actions. Nor have Plaintiffs or Class Members consented to Facebook's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

116. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a) and injunctive relief to stop the violations alleged herein.

**Count III**

**Unfair Competition Law ("UCL")**

**Bus. & Prof. Code §§ 17200, *et seq*.**

117. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

118. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (UCL). By engaging in the practices aforementioned, Defendant has violated the UCL.

119. Defendant's "unlawful" acts and practices include its violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632; and Cal. Civil Code § 53.5.

120. Defendant's conduct violated the spirit and letter of these laws, which protect privacy interests and prohibit unauthorized disclosure and collection of private, personal data and communications.

121. Defendant's "unfair" acts and practices include its violation of privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Plaintiffs and Class members need not establish that these statutes were actually violated, although the claims pleaded herein do so.

122. Defendant's conduct constitutes unfair business practices under the UCL because these practices offend established public policy and hurt Plaintiffs and class members, which cannot be reasonably avoided, and that outweighs any benefit to consumers or competition. The conduct also is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

123. Defendant's appropriation of class members' private, personal data and communications was to its economic and commercial advantage. Defendant has generated substantial revenue from this unlawful practice through targeted advertising.

124. At no time has Defendant affirmatively sought consent from class members before appropriating their private, personal data and communications.

125. Plaintiffs and class members received no compensation from Defendant's use of their private, personal data and communications.

126. California's UCL allows anyone to bring an action for injunctive relief if they have "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. § 17204.

127. Plaintiffs lost money or property because of Defendant's unfair and unlawful practices in violation of the UCL. If not for its violation of the law, Defendant would have paid Plaintiffs and Class members for consent to disclose and/or use their personal information and communications or ceased such disclosure and/or use.

128. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' right to control the dissemination and use of their personal information.

129. Plaintiffs' and class members' private, personal data and communications are likely to remain available to Defendant, without Plaintiffs' and class members' consent, and without

compensation from Defendant for its appropriation and use. Indeed, the longer Defendant is allowed to continue its practices the more information that it can unfairly and unlawfully collect.

130. Plaintiffs seek an order to enjoin Defendant from such unlawful, unfair and fraudulent business acts or practices and to restore to Plaintiffs their interest in money or property that might have been acquired by Defendant through unfair competition.

131. Defendant reaped unjust profits and revenues in violation of the UCL. This includes Defendant's profits and revenues from their targeted advertising. Plaintiffs and the Class seek restitution and disgorgement of these unjust profits and revenues.

## Count IV

## Unjust Enrichment

132. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

133. Plaintiffs and Class members conferred a benefit on Defendant in the form of personal, private data which has substantial monetary value that Defendant extracted and used to produce revenue and unjustly retained those benefits at the expense of Plaintiffs and Class members.

134. Defendant collected and used and made available this information for their own gain, reaping economic, intangible, and other benefits.

135. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

136. Plaintiffs and Class members did not consent to the collection and use of their personal, private data, nor did they have any control over its use. Therefore, under principles of equity and good conscience, Defendant should not be permitted to retain any money derived from their use of Plaintiffs and Class members' personal, private data.

137. The benefits that Defendant derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles to permit Defendant's retention of any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment against Defendant as follows:

A. For an order certifying the proposed Class and Subclasses pursuant to Code of Civil Procedure section 382;

B. For an order appointing Plaintiffs and their counsel to represent the Class;

C. For an order declaring that Defendant's conduct violates the statute referenced herein;

D. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

E. For an order enjoining Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with it, from the misconduct described herein;

F. For actual and compensatory damages according to proof pursuant to code and all other applicable laws and regulations;

G. For restitution to the extent permitted by applicable law;

H. For punitive damages pursuant to Civil Code section 3294(c)(3) or any other grounds the Court may deem just and proper;

I. For pre-judgment and post-judgment interest;

J. For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

K. For such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

Dated this October 9, 2024.

Erickson Kramer Osborne LLP

*/s/ Kevin Osborne*

Julie C. Erickson
Elizabeth A. Kramer
Kevin M. Osborne
44 Tehama Street
San Francisco, CA 94105
Phone: 415-635-0631

Eric S. Dwoskin
Dwoskin Wasdin LLP
433 Plaza Real, Ste. 275
Boca Raton, Florida 33432
Phone: 561-849-8060

*Attorneys for Plaintiffs and the Proposed Class*